PARKER, Justice.
Johnson Controls, Inc. (“JCI”), appeals a summary judgment entered by the Randolph Circuit Court (“the circuit court”) in favor of Liberty Mutual Insurance Company (“Liberty Mutual”). We reverse the judgment and remand the case.

Facts and Procedural History

This case arises out of a July 13, 2010, contract (“the contract”) between Roanoke Healthcare Authority (“Roanoke Healthcare”), a public entity, doing business as Randolph Medical Center (“the medical center”), and Batson-Cook Company *251 (“Batson-Cook”), a general contractor, to renovate the medical center, which is located in Roanoke. • The contract price was $1,059,000.
To avoid the unnecessary payment of sales and use taxes, the contract provided as follows in § 8.6:
“SALES TAX AVOIDANCE: The Owner, [Roanoke Healthcare,] is owned by the City of Roanoke. It is exempt by law from the payment of sales/use taxes. As such it is authorized to and desires to enter into a purchasing agent agreement with [Batson-Cook] whereby [Roanoke Healthcare] will purchase all, or a portion of, the materials, supplies, equipment, and other items (hereinafter referred to as ‘materials’) necessary for the performance of this Contract by [Batson-Cook] and its subcontractors and thereby save the amount of the sales and use tax thereon.
“SALES AND USE TAXES ARE INCLUDED IN THE CONTRACT SUM: The base bid submitted on the proposal form and the Contract Sum ... INCLUDES the cost of all required taxes, including sales and use taxes; therefore, sales and use taxes are included in the Contract Sum.
“ACTUAL SAVINGS WILL BE DEDUCTED FROM THE CONTRACT AMOUNT: Prior to Final Payment the amount of sales and use taxes actually saved shall be deducted from the Contract amount by change order.”
(Capitalization in original.) Consistent with these provisions, Batson-Cook and Roanoke Healthcare entered into a purchasing-agent agreement (“the PAA”) on July 30, 2010. The PAA contained the following relevant provisions:
“a) During the prosecution of Project^ the renovations to the medical center], [Batson-Cook] is appointed authority to act as [Roanoke Healthcare’s] purchasing agent to bind [Roanoke Healthcare] contractually for the purchase of tangible personal property necessary to carry out [Batson-Cook’s] contractual obligations related to Project,
“b) [Batson-Cook] is solely responsible for pricing and availability of tangible personal property necessary to carry out [Batson-Cook’s] contractual obligations related to Project,
“c) Title to all materials and supplies purchased pursuant to such appointment shall immediately vest in [Roanoke Healthcare] at the point of delivery,
“d) [Batson-Cook] shall notify all vendors and suppliers of this agency relationship and make it clear to such vendors and suppliers that the obligation for payment is that of [Roanoke Healthcare] and not [Batson-Cook],
“e) All purchase orders and remittance devices furnished to the vendors shall clearly reflect this agency relationship,
[[Image here]]
“i) The net amount paid for tangible personal property purchased under this agreement shall be deducted from the total amount that would otherwise be due from [Roanoke Healthcare] to [Bat-son-Cook] under the Project agreement,
[[Image here]]
“k) This agreement does not apply to tools, machinery, equipment, materials, supplies, or other property not incorporated into Project.”
The contract falls within the scope of Alabama’s “little Miller Act,” § 39-1-1 et seq., Ala.Code 1975, which provides, in part:
“(a) Any person entering into a contract with an awarding authority in this state for the prosecution of any public works shall, before commencing the work, execute a performance bond, with *252 penalty equal to 100 percent of the amount of the contract price. In addition, another bond, payable to the awarding authority letting the contract, shall be executed in an amount not less than 50 percent of the contract price, with the obligation that the contractor or contractors shall promptly make payments to all persons supplying labor, materials, or supplies for or in the prosecution of the work provided in the contract and for the payment of reasonable attorneys’ fees incurred by successful claimants or plaintiffs in civil actions on the bond.
“(b) Any person that has furnished labor, materials, or supplies for or in the prosecution of a public work and payment has not been made may institute a civil action upon the payment bond and have their rights and claims adjudicated in a civil action and judgment entered thereon. Notwithstanding the foregoing, a civil action shall not be instituted on the bond until 45 days after written notice to the surety of the amount claimed to be due and the nature of the claim. The civil action shall be commenced not later than one year from the date of final settlement of the contract. The giving of notice by registered or certified mail, postage prepaid, addressed to the surety at any of its places of business or offices shall be deemed sufficient under this section. In the event the surety or contractor fails to pay the claim in full within 45 days from the mailing of the notice, then the person or persons may recover from the contractor and surety, in addition to the amount of the claim, a reasonable attorney’s fee based on the result, together with interest on the claim from the date of the notice.”
Pursuant to § 39-l-l(a), on September 1, 2010, Batson-Cook obtained a payment bond from Liberty Mutual in the amount of the contract price — $1,059,000. The payment bond specifically provided “that beneficiaries or claimants hereunder shall be limited to the subcontractors, and persons, firms, and corporations having a direct contract with [Batson-Cook] or its subcontractor.”
On October 22, 2010, Batson-Cook entered into a subcontract (“the subcontract”) with Hardy Corporation (“Hardy”) to perform “mechanical” work required by the contract; the subcontract price was $329,791. The subcontract specifically called for Hardy “to provide all material, labor, supervision, and equipment necessary to complete [the] scope of work in accordance with the contract documents.” On October 27, 2012, Batson-Cook sent a letter to Hardy informing it as follows:
“Batson-Cook ... is providing construction services to Roanoke Healthcare ... in support of the Renovations to [the] Randolph Medical Center project. As an agent of [Roanoke Healthcare], all purchases of tangible personal property to be incorporated into the realty by Batson-Cook ... (and our subcontractors/vendors) in support of the stated construction project will be paid directly by [Roanoke Healthcare], but addressed to Batson-Cook ... who will forward them on to [Roanoke Healthcare] for payment. [Roanoke Healthcare] payments will be issued directly to the material supplier. Batson-Cook ... will be responsible for maintaining the documentation necessary to support the tax exempt nature of such purchases for review.”
In the course of bidding on the subcontract, Ronnie Vines, Hardy’s project manager for the medical-center renovation, received a quote from JCI on July 27, 2010, for equipment and material Hardy would need to complete its obligations under the *253 subcontract. Vines stated in his deposition testimony that before he submitted the purchase order for the equipment and materials that were eventually furnished by JCI he informed JCI that Roanoke Healthcare would pay for the equipment and materials directly and that the invoices should be billed to Roanoke Healthcare but that Hardy would collect the invoices and transmit them to Batson-Cook, which would then forward the invoices on to Roanoke Healthcare for payment. On October 21, 2010, Vines sent Marc Newton, a JCI employee, an e-mail to which he attached a letter from the Alabama Department of Revenue (“ADR”) stating that Roanoke Healthcare was a tax-exempt entity. Vines also stated in his deposition testimony that he never told JCI that Bat-son-Cook would be responsible for payment.
On November 4, 2010, Vines signed and submitted a purchase order on Hardy’s letterhead to JCI for equipment and materials totaling $147,000 per the quote provided by JCI. The purchase order called for the equipment and materials to be shipped to the medical center “c/o Batson-Cook Company” and directed JCI to telephone Hardy 24 hours before delivery. The purchase order also contained the following notation: “P.O., Randolph County Medical Center, c/o Batson-Cook Company.” Vines stated in his deposition testimony that he included this note because the purchase order was actually on “behalf of [Roanoke Healthcare]” and the equipment was to be “billed directly to [it].” Vines also stated that he submitted the purchase order on Hardy’s letterhead because Roanoke Healthcare did not provide its own letterhead. The purchase order also contained a provision stating that it “constitute[d] the full understanding of the parties, and the complete and exclusive statement of the terms of their agreement.” On November 5, 2010, Vines also e-mailed Amy Carmada, an individual Vines described as JCI’s billing clerk, and attached Batson-Cook’s October 27, 2010, letter to Hardy and the letter from ADR showing that Roanoke Healthcare was exempt from sales and use taxes. In the email, Vines asked Carmada to read the attached information and to telephone Vines to discuss the billing method. It is unclear from the record whether a subsequent conversation took place.
Vines’s deposition testimony concerning JCI’s performance and the relationship between the subcontract and the purchase order contained the following:
“[JCI’s trial attorney:] Okay. Let’s talk about Hardy’s subcontract with Batson-Cook. Would you agree that the Hardy and Batson-Cook subcontract included the equipment and the materials that JCI provided to this project in both the scope of work and the contract price?
“[Vines:] Yes, the subcontract and the pricing included all the equipment and material for this project for our portion of the work, that is correct.
“[JCI’s trial attorney:] And ... the Batson-Cook/Hardy subcontract scope of work also included the equipment?
“[Vines:] That is correct.
“[JCI’s trial attorney:] And would you agree with me that at the time you issued the purchase order to [JCI] that the equipment that [JCI] was to provide to the project was part of Hardy’s scope of work and included in Hardy’s subcontract price?
“[Vines:] That is correct.
“[JCI’s trial attorney:] And would you agree with me that at the time [JCI] delivered the equipment and materials to the project that it was part of Hardy’s scope of work under the subcontract and Hardy’s subcontract price?
*254 “[Vines:] Yes. At that time, it was still in the pricing of our subcontract with Batson-Cook.
“[JCI’s trial attorney:] And also within the scope of work of your subcontract with Batson-Cook?
“[Vines:] Yes.
“[JCI’s trial attorney:] At the time [JCI] invoiced for the materials and equipment provided to the project, would you agree with me that at that time it was still part of Hardy’s scope of work and Hardy’s contract price under its subcontract with Batson-Cook[?]
“(Vines:] That is correct.
[[Image here]]
“[JCI’s trial attorney:] And were the materials and equipment provided by [JCI] on this project accepted by Hardy ...?
“[Vines:] Yes.
“[JCI’s trial attorney:] And were the materials and equipment provided by [JCI] to the project accepted by Batson-Cook?
“[Vines:] Yes.
“[JCI’s trial attorney:] And were the materials and equipment provided by [JCI] accepted by [Roanoke Healthcare]?
“[Vines:] Yes.
“[JCI’s trial attorney:] And to , your knowledge, w[ere] the materials and equipment provided by [JCI] incorporated into the project?
“[Vines:] Yes, that is correct.”
Richard Copelan, a branch manager for JCI, stated the following in his affidavit testimony:
“8. During the time period at issue in [this case], I was the Systems HVAC Branch Manager for JCI. In this capacity, I regularly review, negotiate, and approve purchase orders issued to JCI. I have personal knowledge regarding JCI’s involvement on the [medical-center-renovation] Project....
“4. On November 4, 2010, Hardy ... issued [the] purchase order ... to JCI for equipment to be provided to the Project.
“5. In negotiating, reviewing and accepting the Purchase Order, JCI had no communications with [Roanoke Healthcare].
“6. [Roanoke Healthcare] was not a party to the Purchase Order issued by Hardy.
“7. The Purchase Order was the only agreement to which JCI was a party that involved the material and equipment provided by JCI to the Project.
“8. The Purchase Order was the only agreement to which JCI was a party that involved payment for the material and equipment provided by JCI to the Project.
“9. JCI did not have any agreement with [Roanoke Healthcare] or any third-party regarding payment for the equipment and materials furnished by JCI to the Project.
“10. JCI never agreed to look solely to [Roanoke Healthcare] for payment of the equipment and materials furnished by JCI to the Project.
“11. JCI never agreed to waive its rights under the Payment Bond issued by Liberty Mutual ... for the Project.
“12. JCI never agreed to waive its rights under the Alabama ‘little Miller Act’ as it relates to the materials and equipment furnished by JCI to the Project.
“13. JCI never agreed to waive its rights under the Purchase Order issued by Hardy.”
Katherine Lynn, director of the Alabama Building Commission, described in *255 her affidavit testimony her experience with contracts similar to the ones entered into in this case:
“3. It is a very common practice in the State of Alabama for owners of public projects to make direct payments to the suppliers of a project’s general contractor[]. This is done as an arrangement to take advantage of the owner’s tax exempt status. In my experience with public contracts, I believe this owner paid arrangement occurs in a very high percentage of the public contracts in Alabama. Based on the projects that I am aware of it is rare for a public project to have an arrangement other than this arrangement where the cost of the materials is included in the contract amount and the bonds and [the] owner pays the suppliers.
“4. The State of Alabama Building Commission ... publishes sample agreements related to this sales and use tax arrangement.[1]
“5. Additionally, the Alabama Building Commission also publishes Guidelines for [Sales] and Use Tax Savings Arrangements for Public Construction and Improvement Projects on its website that addresses this arrangement.
“6. Under these arrangements the general contractor retains the traditional responsibilities and liabilities for the materials purchased, except that the owner must pay vendors directly for materials purchased by the contract as agent for the owner in order to realize the sales tax savings.”
On January 31, 2011, and again on February 22, 2011, JCI submitted an invoice to Hardy. The invoice states that it was billed to “Randolph County Medical Cén-ter, c/o Hardy Corporation.” The total balance indicated on the invoice is $147,000, which represents the cost of the equipment and materials, exclusive of sales tax.
On March 16, 2011, Patricia Kettner, an employee of JCI, sent an e-mail to Kelly Myers, an employee of Hardy, stating that JCI’s records indicated that the invoices would be paid directly by Roanoke Healthcare and inquiring whether Kettner should contact Roanoke Healthcare directly or go through Hardy to discuss payment. Myers replied to Kettner’s e-mail by informing her that Kettner would need to contact Vines and supplied his contact information; Kettner then forwarded the emails to Vines and asked him to advise her on the status of the invoice to Roanoke Healthcare or to supply her with the name and number of a Roanoke Healthcare representative so that she could inquire about payment of the invoice.
On March 24, 2011, Batson-Cook received written notice from Roanoke Healthcare that work on the renovation project had been suspended. On March 30, 2011, Batson-Cook notified Hardy of the suspension and stated that “[t]he contract has been suspended by [Roanoke Healthcare] through no fault of Batson-Cook ... or its subcontractors. [Roanoke Healthcare] is currently out of funding and has subsequently closed the facility while seeking a buyer.” Liberty Mutual alleged in its answer that Roanoke Healthcare has failed to pay Batson-Cook $241,940.51 for work performed pursuant to the contract.
On March 30, 2011, Batson-Cook sent Hardy a change order stating:
*256 “Roanoke Healthcare ... is exempt by Alabama law from the payment of sales/use taxes on [its] purchase of tangible ... property incorporated into the facility. Batson-Cook acted as a Purchasing Agent for the facility to utilize the tax exemption status of [Roanoke Healthcare] for material purchases; therefore, the obligation for payment is that of [Roanoke Healthcare] and not Batson-Cook.
“This change order shall serve to remove all material costs for items purchased directly by [Roanoke Healthcare] along with any associated taxes related to this purchase included in your subcontract amount.”
Among other things, the change order deducted from the subcontract the $147,000 in equipment and materials JCI had furnished for the renovation project and for which it has not received payment.
In accordance with § 39-l-l(b), JCI notified Liberty Mutual, Roanoke Healthcare, Batson-Cook, and Hardy by certified letters dated May 4, 2011, of its claim on the payment bond. The letters identified Batson-Cook as the general contractor and Hardy as the debtor. Liberty Mutual denied the claim.
On November 10, 2011, JCI sued Liberty Mutual, alleging that JCI is entitled to payment on the payment bond Liberty Mutual had issued to Batson-Cook pursuant to § 39-l-l(a). On December 8, 2011, Liberty Mutual filed its answer and denied liability.
On October 12, 2012, JCI filed a motion for a summary judgment. Following a hearing on JCI’s summary-judgment motion, held on December 6, 2012, the circuit court issued an order denying JCI’s motion because it determined that genuine issues of material fact existed.
On November 29, 2012, before the hearing on JCI’s motion, Liberty Mutual responded to JCI’s motion by filing a cross-motion for a summary judgment.[2] In its motion, Liberty Mutual argued:
“A long standing rule of law in Alabama with respect to payment bonds is that if there is no right of recovery against the general contractor, then there is no right of recovery against the surety on a payment bond. Magic City Paint & Varnish Co. v. American Surety Co. of New York, 228 Ala. 40[,] 152 So. 42 [ (1934) ]. In this instant action, the equipment supplied by JCI for which it seeks to recover in this lawsuit was outside of the scope of the contract between the general contractor and the owner of the project at issue. As such, it is outside of the scope of the ‘[w]ork’ as defined in the contract and payment bond at issue. The equipment supplied by JCI was supplied at the owner’s request, directly to the owner. Accordingly, no liability may be had against the contractor, and thus, there is no right of recovery against Liberty [Mutual].”
Liberty Mutual also argued that § 8.6 of the contract “clearly excludes ... materials, supplies, and equipment” like those provided by JCI.
On February 14, 2013, JCI filed a brief in opposition to Liberty Mutual’s summary-judgment motion. In its brief, JCI argued that Liberty Mutual’s summary-judgment motion should be denied because the circuit court had found that genuine issues of material fact existed when it considered and denied JCI’s summary-judgment motion. JCI also argued that there was no evidence to support Liberty Mutual’s argument that the equipment fur *257 nished by JCI was outside the scope of the contract and the payment bond. JCI argued that the evidence indicated that the equipment and materials furnished by JCI were included in the scope of work under the contract and in the price of Hardy’s subcontract -with Batson-Cook. JCI also argued that by accepting the purchase order from Hardy, JCI had entered into a direct contract with Hardy and, therefore, was entitled to payment from Liberty Mutual because the payment bond defined beneficiaries or claimants as “subcontractors, and persons, firms, and corporations having a direct contract with the principal or its subcontractor.” JCI also noted that the payment bond was issued for the precise amount of the contract price — $1,059,-000 — and that the PAA called for “the net amount paid for tangible personal property purchased under this agreement [to] be deducted from the total amount that would otherwise be due from [Roanoke Healthcare] to [Batson-Cook] under the Project agreement.” (Emphasis added.) JCI argued that, under the terms of the PAA, payment for the equipment and materials JCI furnished for the project would be deducted from the amount due under Roanoke Healthcare’s contract -with Batson-Cook only upon actual payment from Roanoke Healthcare to JCI, which undisputedly has not occurred.
Finally, JCI argued that Liberty Mutual’s argument that the equipment and materials furnished by JCI were outside the scope of the contract was inconsistent with the fundamental purpose of Alabama’s little Miller Act, which is “to ensure that a materialman receives full payment for labor or materials that he supplies to a public works project,” SGB Constr. Servs., Inc. v. Ray Sumlin Constr. Co., 644 So.2d 892, 895 (Ala.1994), and “to ‘shift the ultimate risk of nonpayment from workmen and suppliers to the surety.’ ” Federal Ins. Co. v. I. Kruger, Inc., 829 So.2d 732, 736 (Ala.2002) (quoting trial court’s order).
On June 7, 2013, JCI filed a renewed motion for a summary judgment. In its brief in support of its renewed summary-judgment motion, JCI made the following argument:
“[A] claimant must satisfy the following four elements to be entitled to a recovery under the payment bond: ‘(1) that materials or labor were supplied for work on the public project at issue; (2) that the supplier was not paid for the materials or labor supplied; (3) that the supplier had a good faith belief that the materials furnished were for the project in question; arid (4) that the jurisdictional requisites [i.e., timely notice and filing of suit] had been met.’ Federal Ins. Co. v. I. Kruger, Inc., 829 So.2d 732, 736 (Ala.2002). The undisputed facts in this case are sufficient to satisfy each of the four elements of the analysis and demonstrate that JCI is entitled to recover against the Payment Bond issued by Liberty Mutual.”
On June 21, 2013, Liberty Mutual filed a brief in opposition to JCI’s renewed summary-judgment motion and reasserted its argument that the equipment and materials supplied by JCI were outside the scope of the contract because Roanoke Healthcare was to issue payment directly to JCI. Accordingly, Liberty Mutual made the following argument:
“[I]f the labor, materials, or supplies fall outside of the scope of the work as set forth in the contract between the general contractor and the owner, no proper payment bond claim may be made. Stated another way ‘[a]ll other questions may therefore be laid aside, as of course, if liability be not shown against the contractor, clearly none can be established against the surety.’ Magic City Paint & Varnish Co.[ v. American Surety Co. *258 of New York, 228 Ala. 40,] at 44[, 152 So. 42, 44 (1934)]; see also [Hicks, supra]. ‘ [ “ ]The threshold issue on [the] bond is whether the contractor ... is liable to the subcontractor ... for labor, materials, or supplies.[ ” ] ’ [Hicks, 674 So.2d at 547 (quoting trial court’s order)]. ‘ [ “ ]The contractor must be liable for some claim, however, before the surety can be liable.[ ” ] ’ Id.”
On June 26, 2018, the circuit court held a hearing on both Liberty Mutual’s cross-motion for a summary judgment and JCI’s renewed motion for a summary judgment.
On July 28, 2013, the circuit court issued the following order:
“On June 26, 2013, the court called for hearing [JCI’s] renewed motion for a summary judgment and [Liberty Mutual’s] cross-motion for a summary judgment. All parties were represented by counsel. Extensive argument along with copies of various exhibits to the briefs of both parties were submitted by counsel. The court heard, reviewed and considered the same, along with previous submissions on file and in the record.
“After consideration of all submissions, the court finds that the equipment and materials at issue were purchased directly from [JCI] by [Roanoke Healthcare] and thus were outside of the scope of the contract between [Roanoke Healthcare] and [Batson-Cook], the general contractor, who was also acting as the purchasing agent of [Roanoke Healthcare]. Since the equipment and materials at issue were outside the scope of the contract between [Batson-Cook] and [Roanoke Healthcare], they are not covered by the payment bond pursuant to the Alabama Little Miller Act (Ala. Code [1975,] § 39-1-1 et seq.), which applies only to labor, materials and supplies for or in prosecution of the work included in contracts between the owner and the contractor for public work projects.
“Accordingly, the court hereby finds that there is no genuine issue of material fact and [Liberty Mutual] is entitled to judgment as a matter of law pursuant to Rule 56 of the Alabama Rules of Civil Procedure and hereby denies [JCI’s] renewed motion for a summary judgment and grants [Liberty Mutual’s] cross-motion for a summary judgment. This resolves all issues pending before the court; therefore, this is a final order.”
JCI appealed, challenging both the summary judgment in favor of Liberty Mutual and the denial of its renewed motion for a summary judgment.

Standard of Review

“‘The standard of review applicable to a summary judgment is the same as the standard for granting the motion....’ McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957, 958 (Ala.1992).
“‘A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of *259 such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).’
“Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).”
Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935 (Ala.2006).

Discussion

JCI’s claim against Liberty Mutual is based upon its argument that it is a proper claimant under the payment bond issued by Liberty Mutual to Batson-Cook pursuant to Alabama’s little Miller Act. As this Court noted in Safeco Insurance Co. of America v. Graybar Electric Co., 59 So.3d 649, 655-56 (Ala.2010):
“[Section] 39-1-1 et seq., Ala.Code 1975, [is] commonly referred to as Alabama’s little Miller Act. Federal Ins. Co. v. I. Kruger, Inc., 829 So.2d 732, 734 (Ala.2002). The Alabama statute is patterned after the Federal Miller Act, now codified at 40 U.S.C. §§ 3131-3133. ‘The construction given to the federal act has been adopted in Alabama, unless otherwise noted.’ Kruger, 829 So.2d at 734 n. 1. Generally, when a person has provided labor or materials or has supplied services on a private construction project, the person is entitled under § 35-11-210, Ala.Code 1975, the mechanic’s or materialman’s lien statute, to file a lien against the private property and subsequently to foreclose on the property, if not paid for those services. However, § 35-11-210 does not apply to public property. Martin v. Holtville High School Bldg., 226 Ala. 45, 145 So. 491 (1933) (public-school building was not subject to foreclosure sale under the predecessor statute to § 35-11-210). The Alabama Legislature provided a remedy in 1927 when it codified specific provisions to ensure that materialmen receive full payment for labor or materials supplied on a public-works project. § 39-1-1. Alabama’s statute was patterned after a federal act enacted in 1894 called the. Heard Act. Ch. 280, 28 Stat. 278 (1894) (since repealed); see also State v. Southern Sur. Co., 221 Ala. 113, 127 So. 805 (1930) (discussing the essential provisions of the state and federal payment-bond statutes existing in 1930). Alabama first amended its public-works-payment-bond statute in 1935 to pattern it after the federal act called the Miller Act (enacted in 1935 to rectify inadequate protections in the Heard Act). See 40 U.S.C. §§ 3131-3133 (formerly 40 U.S.C. §§ 270a-270d).
“ ‘[T]he purpose of a payment bond required under the little Miller Act is to “shift the ultimate risk of nonpayment from workmen and suppliers to the surety.” ’ Kruger, 829 So.2d at 736 (quoting American Sur. Co. v. Hinds, 260 F.2d 366, 368 (10th Cir.1958)). ‘The purpose of the [little Miller] act is to provide security for those who furnish labor and material in performance of government contracts as a substitute for unavailable lien rights, and is liberally construed to accomplish this purpose.’ Headley v. Housing Auth. of Prattville, 347 So.2d 532, 535 (Ala.Civ.App.1977).”
Under Federal Insurance Co. v. I. Kruger, Inc., supra, a supplier is entitled to recover under a payment bond issued pursuant to Alabama’s little Miller Act if the supplier establishes:
*260 “ ‘ “(1) that materials or labor were supplied for work on the public project at issue; (2) that the supplier was not paid for the materials or labor supplied; (8) that the supplier had a good faith belief that the materials furnished were for the project in question; and (4) that the jurisdictional requisites had been met.” ’ ”
829 So.2d at 786 (quoting A.G. Gaston Constr. Co. v. Hicks, 674 So.2d 545, 547 (Ala.Civ.App.1995), quoting in turn United States ex rel. Krupp Steel Prods., Inc. v. Aetna Ins. Co., 831 F.2d 978, 980 (11th Cir.1987)).
As set forth above, the circuit court concluded in its final order that the equipment and materials supplied by JCI were not furnished by JCI for or in prosecution of the public work included in the contract because, it found, the items were purchased directly from JCI by Roanoke Healthcare. JCI argues on appeal that the undisputed facts indicate that the equipment and materials it supplied were furnished for the prosecution of the renovation project provided for in the contract and that JCI is a proper claimant on the payment bond under the four-part test set forth in Kruger. Accordingly, JCI argues that the summary judgment in favor of Liberty Mutual is due to be reversed and that it is entitled to a summary judgment in its favor. We agree with JCI.
As a threshold matter, the circuit court found that JCI sold the equipment and materials directly to Roanoke Healthcare. Although JCI disputes this fact on appeal, it is immaterial to a determination whether JCI is a proper claimant under the payment bond. As opposed to the federal Miller Act, supra, and the little Miller Acts adopted by several of our sister states, § 39-1-1 is silent as to the issue of privity of contract.[3] Rather, § 39-1-1(b) focuses exclusively on the intent for which the labor, materials, or supplies are furnished by using the following broad language: “Any person that has furnished labor, materials, or supplies for or in the prosecution of a public work ... may institute a civil action upon the payment bond....”
The terms of the payment bond here limit claimants to those having a direct contract with either the contractor or a subcontractor. However, when a payment bond is issued to satisfy the provisions of § 39-1-1, as it was in the present case, the requirements of the statute will be read into the bond. See Kruger, 829 So.2d at 736 (“Where a payment bond shows on its face that it was executed in compliance with the [little Miller] Act, a court is authorized to read into the bond the provisions of the statute and to give the bond the form and effect the statute contemplated, regardless of the contents of the bond.”); Water Works, Gas & Sewer Bd. of the City of Oneonta, Inc. v. P.A. Buchanan Contracting Co., 294 Ala. 402, 405-06, 318 So.2d 267, 269 (1975) (“This court has held that even when a bond ... is not literally in statutory form, if it was given ‘for the purposes named in the statute and accepted and acted upon as such,’ the statute will be read into the bond. *261 Royal Indemnity Co. v. Young & Vann Supply Co., 225 Ala. 591, [594,] 144 So. 532[, 584 (1932) ].”); American Cas. Co. of Reading, Pa. v. Devine, 275 Ala. 628, 640, 157 So.2d 661, 672 (1963) (“[T]his court has said that there was no compulsion on the surety to execute such a bond, but since the surety did so, knowing the purpose for which the bond was given and being charged with knowledge of the law which required the bond, the bond must be construed and applied as if the parties making it had complied with the law. Universal Electric Const[r]. Co. of Alabama v. Robbins, 239 Ala. 105, 194 So. 194 [ (1940) ]. The bond shows on its face that it was executed in compliance with the statute and the court is authorized to read into it the provisions of the statute, ‘and give it the form and effect the statute contemplated, regardless of its contents.’ 239 Ala. at 109, 194 So. at 198. In short the statute is written into the bond.”). Thus, JCI is a proper claimant on the payment bond if it demonstrates that it is statutorily eligible under the four-part test set forth in Kruger.
First, under Kruger, JCI must show that the equipment and materials it furnished “were supplied for work on the public project at issue.” Kruger, 829 So.2d at 736. As set forth above, the contract and the PAA obligated Batson-Cook to procure the tangible personal property necessary for the completion of Batson-Cook’s obligations under the contract. The purchasing power granted by the PAA was limited to items Batson-Cook needed to perform its obligations under the contract. While the renovation project was ongoing, Batson-Cook entered into a subcontract with Hardy to perform the mechanical work for the project and “to provide all material, labor, supervision, and equipment necessary to complete [the] scope of work in accordance with the contract documents.” Hardy, after being awarded the subcontract and with knowledge of the existence of the PAA, submitted a purchase order to JCI for equipment and materials necessary for Hardy’s performance under the subcontract. The purchase order indicates that it was submitted pursuant to a bid provided by JCI to Hardy before Roanoke Healthcare awarded the project to Batson-Cook. The purchase order called for the equipment and materials to be shipped to the medical center ‘Vo Batson-Cook Company” and directed JCI to telephone Hardy 24 hours before delivery. JCI furnished the equipment and materials to the project site, and the equipment and materials were accepted and incorporated into the renovation of the medical center.
Vines’s deposition testimony indicates that the equipment and materials furnished by JCI were included in Hardy’s subcontract with Batson-Cook, both in the scope of work and in the price of the subcontract, and were incorporated into the renovation project pursuant to Bat-son-Cook’s contract with Roanoke Healthcare. Vines’s deposition testimony is consistent with the fact that the amount of the payment bond equals the exact amount of the contract price, which covered the cost of Batson-Cook’s subcontract with Hardy, including the cost of the equipment and materials furnished by JCI pursuant to the purchase order submitted to JCI by Hardy. Accordingly, JCI has demonstrated that the equiphient and materials it supplied were furnished for work on the renovation of the medical center called for under the contract and, therefore, has satisfied the first prong of the Kruger test.
Additionally, we note that the fact that JCI agreed to accept payment from Roanoke Healthcare neither precludes a conclusion that JCI furnished the equipment and materials for the pubic work nor nec *262 essarily removes JCI from the protection of § 39-1-1, which was enacted “ ‘to provide security for those who furnish labor and material in performance of government contracts as a substitute for unavailable lien rights, and is liberally construed to accomplish this purpose.’” Safeco, 59 So.3d at 656 (quoting Headley v. Housing Auth. of Prattville, 347 So.2d 532, 535 (Ala.Civ.App.1977)). Because JCI would have lien rights available to it but for the fact that Roanoke Healthcare is a public entity, we construe § 39-1-1 so as to effectuate the purpose for which it was enacted.
Second, it is undisputed that JCI has not been paid; thus, JCI had satisfied the second prong of the Kruger test — that it was not paid for the equipment and materials it furnished for the renovation project.
Third, JCI must show that it had a good-faith belief that the equipment and materials it furnished were furnished for the renovation project. As set forth above, the purchase order indicates that the equipment and materials were ordered for use in the renovation project. Additionally, e-mails and telephone conversations between employees of Hardy and JCI indicate that JCI had knowledge that the equipment and materials were needed for the renovation project. Moreover, JCI delivered the equipment and materials to the project site. Thus, JCI had a good-faith belief that the equipment and materials were furnished for the project in question; therefore, the third prong of the Kruger test is satisfied.
Fourth, JCI must show that it satisfied the jurisdictional requisites of § 39-l-l(b) before commencing this action. Section 39 — 1—1(b) provides that “a civil action shall not be instituted on the bond until 45 days after written notice to the surety of the amount claimed to be due and the nature of the claim.” Furthermore, § 39 — 1—1(b) provides that “[t]he civil action shall be commenced not later, than one year from the date of final settlement of the contract.” On March 24, 2011, Roanoke Healthcare notified Batson-Cook that it was suspending the renovation project; Batson-Cook notified Hardy of the suspension on March 30, 2011. JCI notified Liberty Mutual, Batson-Cook, and Hardy by letters dated May 4, 2011, that it was making a claim on the payment bond. JCI then filed this lawsuit on November 10, 2011 — more than 45 days after giving notice of its claim and within one year from the suspension of the renovation project. Thus, JCI has met the jurisdictional requisites to bring a claim under § 39 — 1—1(b); therefore, the fourth prong of the Kruger test is satisfied.
Liberty Mutual cites Magic City Paint & Varnish Co. v. American Surety Co. of New York, 228 Ala. 40, 152 So. 42 (1934), and Hicks, supra, in support of its argument that the circuit court’s judgment is due to be affirmed because, it argues, JCI has not demonstrated that Batson-Cook is liable for the payment of the equipment and materials furnished by JCI. However, both cases relied upon by Liberty Mutual are inapposite.
In Magic City, the plaintiff agreed to supply paint to a bonded contractor for a public-works project. The agreement allowed for unused paint to be returned for “full credit.” The plaintiff sued the surety for payment for the paint the plaintiff had delivered for the project. The statute that governed the payment bond in Magic City was modeled after the federal Heard Act, as explained in Safeco, supra, rather than after the federal Miller Act, as is the little Miller Act, the pertinent statute here.[4] *263 The trial court held that the surety was liable only for the paint that was used. The plaintiff appealed to this Court, arguing that it was entitled to full payment under the bond for both the used and the unused paint. However, this Court found that the record indicated that there was no liability as between the original contracting parties because the contractor had a right to return the unused paint for a full credit. This Court stated that the “[plaintiff, in making the sale, accepted a tentative order only, and has no right to ignore its meaning and effect.” Magic City, 228 Ala. at 42, 152 So. at 43. Accordingly, the Court held that “[a]ll other questions may therefore be laid aside; as of course, if liability be not shown against the contractor, clearly none can be established against the surety.” 228 Ala. at 43, 152 So. at 44. In the present case, the finality of the sale of the equipment and materials furnished by JCI is not in question. It is undisputed that the equipment and materials were accepted and incorporated into the renovation of the medical center and that JCI is entitled to payment. Magic City, therefore, is inapposite.
Hicks likewise does not support Liberty Mutual’s argument. In Hicks, the Court of Civil Appeals upheld a trial court’s finding that a subcontractor who had agreed with the general contractor to be paid for “satisfactory performance” could maintain an action against the bond surety only for work that met the condition precedent to its payment-satisfactory performance. In the present case, it is undisputed that the equipment and materials furnished by JCI were satisfactory and that JCI is entitled to payment. Hicks, therefore, is also inapposite.
JCI has satisfied the four-part test set forth in Kruger; accordingly, JCI is a proper claimant on the payment bond. Therefore, the circuit court erred in entering a summary judgment in favor of Liberty Mutual and denying JCI’s summary-judgment motion.

Conclusion

Based on the foregoing, we reverse the circuit court’s summary judgment in favor of Liberty Mutual and remand the case for the circuit court to enter a summary judgment for JCI.
REVERSED AND REMANDED.
STUART, BOLIN, MURDOCK, MAIN, WISE, and BRYAN, JJ., concur.
MOORE, C.J., and SHAW, J., dissent.

. A sample agreement and a sample contractual provision related to sales-and-use-tax-savings arrangements published by the Alabama Building Commission were attached to a subsequent affidavit given by Lynn and included in Liberty Mutual’s response to JCI’s renewed motion for a summary judgment.

. Liberty Mutual’s cross-motion for a summary judgment was not considered at the December 6, 2012, hearing because of the proximity of its filing to the hearing date.

. See 40 U.S.C. § 3133(b)(2) (provisions pertaining to persons having a direct contractual relationship with a subcontractor); § 13 — 10— 63, Ga.Code Ann. (same); § 255.05(l)(a), Fla. Stat. (mandating that a payment bond cover all persons defined in § 713.01, Fla. Stat., which defines "materialman” in subsection (20) as "any person who furnishes materials under contract to the owner, contractor, subcontractor, or sub-subcontractor on the site of the improvement or for direct delivery to the site of the improvement or, for specially fabricated materials, off the site of the improvement for the particular improvement, and who performs no labor in the installation thereof”).

. The difference between the Heard Act and the Miller Act was explained in Riley-Stabler *263 Construction Co. v. Westinghouse Electric Corp., 396 F.2d 274, 276 (5th Cir.1968):
"The Heard Act specifically provided that bond coverage extended only to materials 'used' on a bonded project. The Miller Act deleted that provision and, as heretofore stated, has been interpreted to cover materials diverted to other uses.
"But irrespective of the historical context, and approaching the issue as an original question, we are constrained to hold that the statutory words ‘for ... the prosecution of the work’ encompass the furnishing of diverted materials as well as non-diverted ones. The insertion of the preposition, 'for,' in the 1935 Act constitutes a significant change over the 1927 Act. The legislature is presumed to have made the change for a purpose. The phrase, as revised in the 1935 Act, shifts the inquiry from how or whether the materials were used to the purpose for which they were supplied. The natural and ordinary connotation of the phrase as it now reads is that a bond covers payment of materials which are used on a bonded project or which are furnished in the contemplation of being used on that project whether they are in fact so used or not.”